Filed 1/30/14  In re R.S. CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re R.S. et al., Persons Coming Under the Juvenile Court Law. | |
| ALAMEDA COUNTY SOCIAL SERVICES AGENCY,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>M.S.,<br><br>Defendant and Appellant. | A138168<br><br>(Alameda County<br>Super. Ct. Nos. J186356,<br>J186357 & OJ12020117) |

Michael S. (father) appeals from a dispositional order made pursuant to Welfare and Institutions Code section 361, subdivision (c)(1),[1] removing his children from his custody and placing them with their paternal grandmother.  Father does not contest the dependency court's finding of jurisdiction under section 360, subdivisions (b) and (c), acknowledging there "may have been sufficient evidence to support dependency jurisdiction."[2]  Rather, he contends the evidence was insufficient to additionally support the removal order.  We affirm.

---

[1]  All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2]  In his notice of appeal, father indicated he was challenging both the court's jurisdictional and dispositional findings.  Given his statement in his opening brief, we

1

## BACKGROUND

On December 18, 2012, the County filed a dependency petition under section 300, subdivision (b), alleging failure to protect three siblings, R.S., L.S. and M.S., in the face of domestic violence against mother, mother's absence from the household, and father's untreated mental health issues. The petition also alleged, under subdivision (c), serious emotional damage as a result of father's abusive conduct, mother's leaving the house, and the children's 19-year-old half brother taunting them that their mother was going to jail and threatening to kick them out of the house. The children were taken into immediate protective custody and placed in foster care.

The petition was precipitated by an alteration between mother and father on December 1, 2012, during which father allegedly was verbally abusive to mother and the children, and threw mother to the ground. Mother was pregnant at the time, left the house, and lost the pregnancy. On December 5, without notice to mother, father obtained a domestic violence TRO and temporary custody order. On December 11, father was arrested, leaving the children with their half brother and a friend of father's.

In the Detention Report, filed December 19, the child welfare worker (CWW) reported mother said she had not miscarried, but had had an abortion several days later because she "afraid something was wrong" with the baby. The CWW "questioned" mother's account of the incident, given his investigation. Mother also reported father selling marijuana from the residence.

R.S., who was 12 years old at the time, did not observe the alleged incident, but heard about it, and said he had seen father hit mother the preceding week. R.S. did not want to remain with his father. L.S., who was then 11 years old, said he saw the incident, but mother fell when father pushed her. L.S. claimed his half brother said if they saw mother she would go to jail and threatened to kick the children out of father's residence. L.S. reportedly had been crying and was distraught, and said he would not return to

---

conclude he has abandoned his appeal from the court's finding of jurisdiction and, to that extent, dismiss his appeal.

father's house because of "safety" concerns. The CWW felt L.S. had been "coached" to say he feared for his safety so he would be sent to live with his mother and paternal grandmother. M.S., who was six years old, said her parents yell and swear, they had had a fight, and mother had moved out. She did not seem concerned about being at home with her older half brother, but said R.S. often cried for their mother.

The grandmother reported she had been custodian of the children between 2003–2007, while both parents were in and out of jail. Although accusations that she abused the children were determined to be unfounded, she relinquished the guardianship. In 2009, mother obtained custody of the children. Between October 2011 and July 2012, mother and the children lived with her. Mother then left with the children and resumed living with father. She described mother as having a chronic and revolving history of drug use, losing housing, going to jail and leaving the children displaced. She stated father has been diagnosed with Bi-Polar disorder, but refused to take medication. In her opinion neither parent is an appropriate care giver, and the children should not reside with them.

The older half brother and the friend of father's with whom the children had initially been left believed the two boys, R.S. and L.S., were rebellious and manipulative, and were trying to insure they would be sent to their grandmother's house.

The CWW recommended the court assume jurisdiction over the children, find the initial removal was necessary, and order reunification services.

On January 4, 2013, the County filed an amended petition, additionally alleging lack of support in that father was incarcerated and unable to care for the children. The County also filed a jurisdiction/disposition report. By this time, the children had been moved out of the foster home and placed with the grandmother. The CWW spoke with father, who acknowledged a domestic violence history and having mental health issues. He had, however, been working as a counselor at a community outreach program before his arrest. He claimed mother had a continuing drug problem, which was facilitated at the grandmother's home, and claimed mother's two older sons were "trouble makers" and drug dealers.

3

The CWW concluded the children were not safe at father's because of the history of domestic violence and because he was then incarcerated. Nor were they safe with mother because of her unstable housing situation, including the fact she has continually "run back to the father" despite the domestic abuse. The CWW believed the children had been in a stable environment with the grandmother, but father "attempted to sabotage the guardianship by forcing the minors to state that they were being mistreated by their grandmother." The children stated their grandmother never abused them, they want to live with her, and they would eventually like to live with their mother, once she is stable.

On January 4, 2013, the court continued the hearing to allow father and his counsel time to review the County reports. On January 14, 2013, father contested jurisdiction, and the court set the matter for hearing on February 22.

The day before the contested hearing, the County filed an Addendum Report reporting that law enforcement had executed a search warrant at the grandmother's residence on February 7. The warrant was focused on mother's two adult sons, and the search yielded eleven items related to the use and sale of marijuana. The grandmother and mother, and the minors, were present during the search. The CWW also reported R.S. and L.S. were having significant problems at school, including refusing to attend class. The grandmother reported the children were "angry" about the situation with their parents and "scared to death" of father in light of the domestic violence history. The grandmother felt "caught in the middle" of the parents' problems.

Mother claimed she was in therapy, attending school, and not using drugs, and the CWW referred her to testing. Father stated he could provide the children a more stable home, and believed the children were being "coached" to say they are afraid of him. He also stated the alleged parole violation for which he had been arrested (mother's claim of restraining order violation) had been dismissed, mother having been found "not credible." The CWW continued to recommend out-of-home placement given the children's exposure to "significant amounts of domestic violence," the parents' history of drug abuse, father's history of mental illness, and the fact there was some stability in the placement with the grandmother.

4

On February 22, 2013, the court held a lengthy hearing at which father and the grandmother testified. At the close of the hearing, counsel for the County acknowledged that its burden with respect to out-of-home placement was clear and convincing evidence. Counsel also acknowledged this was not an easy case—"[t]here is a lot of back and forth of one person saying one thing and another person saying another thing." And while there was some testimony supporting father, counsel asserted the "number one" priority was the safety and well being of the children and urged the court to assume jurisdiction and make the requested disposition findings. Counsel for the children concurred. She agreed the case was "very complicated" and emphasized the children needed "to stabilize" and that need was being met by the grandmother.

Counsel for father argued there was no evidence of a history of domestic violence impacting the children and asserted the alleged December 1 incident had not been substantiated since the CWW doubted mother's version of events and thought L.S. had been "coached" to say he feared for his safety. Counsel also argued there was no information as to father's mental health, other than his generic statement to the CWW that he has suffered from such issues. What the evidence did show, according to counsel, was that father has done time in the past, is now out of prison, actively involved with his children, and participating in community activities. And while the children may want to live with their grandmother, counsel described her home as a "cesspool" because of the presence of mother's two adult sons who are involved in drug dealing and gangs.

While the court agreed there were some serious concerns about the situation at the grandmother's that needed to be immediately addressed, it disagreed there had been no substantiation of domestic violence impacting the children. The court believed there was "much more domestic violence" than father had testified to and was "disturb[ed]" father had skirted the issue of whether mother was pregnant at the time of the December 1 incident. The court pointed out each child reported some domestic strife. While R.S. did not see the December 1 incident, he reported father had hit mother the week before. While the CWW might feel L.S. had been "coached" to say he felt unsafe, the CWW did not dismiss L.S.'s statement that he had seen the December 1 incident and father had

5

pushed mother. It was also unclear what their younger sister, M.S., had seen. (Although not specifically mentioned by the court, M.S. had told the CWW mother and father "yell" and swear, and mother moved out because of conflict with father.) Thus, not only did the court conclude domestic violence had occurred, it concluded the violence "was much more severe than the father has claimed and has testified to." That father had not been forthright, was additional reason for concern and made the matter "very problematic." Given the serious concerns about continued placement with grandmother, the court stated it was continuing the issue of disposition for two weeks.

The County filed a Second Addendum report the day before the continued hearing. The CWW spoke with grandmother about steps taken after the search to insure mother's son who was the target of the warrant was no longer there, there were no unlawful substances in the home, and the home was safe for the children. Grandmother had been very upset by the search and stated she was attempting to find new housing so she and the children could have a "fresh start." She was also trying to get the two boys, who were failing all classes, to focus on the need to change their behavior and attitude towards school. The principal reported that when the problems had started in December, the boys had gone "downhill," but in the preceding week, things had turned around. The change, according to the principal, was "night and day." The youngest child had been doing well in school and continued to do so. Mother, however, had tested positive for methamphetamine, and was not diligent in testing.

The CWW also spoke with the coordinator of a program which father occasionally attended to help with his frustrations in "dealing with his family" and how not to "lash out" when he becomes overwhelmed. The coordinator stated father seeks help "basically when he is in crisis." The coordinator stated father was not doing drugs, and described him as a good person, who is "really concerned" about his children. The coordinator, however, strongly felt father's residence was not a place for children because of the proximity of drug activity. The CWW noted that the interior of father's residence was appropriate for the children.

Father stated he very much wanted his children returned, became emotional talking about the fact he had not seen them, and believed they were saying they are afraid of him because "they will not be able to get away with bad behavior and will have to perform at school." He continued to actively monitor their progress at school.

The CWW spoke with the children, as well. The youngest commented she feels safe with her grandmother. Her father has never hurt her, but she hurts "inside" because he "does stuff to my mother and he hurts her." She does not like going to her father's because it is near a "drug place" and all she can do is stay inside. She enjoys school and said her brothers are trying hard to do better. The two boys "were both smiling and happy" about their better school report. Neither of the boys wanted visits with father. R.S. feared father would try to "pressure" him to leave his grandmother's and return to his house. The CWW believed the children have been exposed to "significant amounts of domestic violence," and recommended continued placement with grandmother.

At the continued hearing, father argued there was no evidence in the Second Addendum "that to return [the children] would do anything to harm them other than force them to be where they express that they choose not to be." The trial court reaffirmed its finding that the children have been exposed to significant domestic violence, making specific note of the youngest child's most recent comments to the CWW. Father, speaking for himself, responded, "[t]hat was never said nothing like that before. Now, all of sudden that she's coming with something like that." He urged that his house was safe for the children, given his vigilance in their safety. The problem, said father, was mother's addiction, and asserted the "whole thing is turning into a lie."

The court summarized the situation as being "difficult." It maintained placement with grandmother to insure the children were "away from the recovering drug addicts," noting also that the children "say, emphatically, they don't want to be there." The court also ordered therapeutic visitation between father and the children, directing the CWW to encourage the children to participate despite their stated desire to have no contact with father, but also stating the CWW was "not to physically force them."

7

*Standing to Appeal*

The County contends father has no "standing" to appeal the dispositional order because he did not have legal custody of the children at the time the court issued the order. The County bases its argument on the fact mother was awarded sole legal and physical custody of the children in June 2008, and the December 2012 TRO father obtained granting custody to him expired by its own terms a month later, in January 2013. Thus, the only custody order in effect at the time of the jurisdictional/dispositional hearing on March 6, 2013, was the order granting sole custody to mother.

Regardless of which parent had legal custody, there is no dispute that at the time the dependency petition was filed, the children were residing with father. Accordingly, the court did not err in considering and ruling on the issue of removal under section 361, subdivision (c)(1), and father, likewise, has "standing" to challenge the court's ruling on appeal. (§ 361, subd. (c)(1) [no dependent child shall be taken from physical custody of parent or custodian "with whom the child *resides* at the time *the petition was initiated*" unless certain findings are made] (italics added).)[3]

*Scope of Appeal*

The County also contends father appealed only the dispositional order pertaining to the oldest child, R.S., and did not file notices of appeal as to L.S. and M.S. The County thus asserts we have no jurisdiction to consider the removal orders pertaining to the two younger children.

However, the second page of father's notice of appeal expressly states the notice of appeal "pertains to the following child or children *specify number of children included*): (3)." Each of the three children is then listed by name. While it appears the case number on the first page refers only to the dependency proceeding for the oldest child, R.S., there can be no doubt whatsoever that father intended to appeal as to all three

---

[3] We therefore deny the County's motion (filed August 20, 2013) to augment the record on appeal/and or request for judicial notice of the custody orders pertaining to mother.

children.  Furthermore, the dependency proceedings of all three were heard at the same time, the record as to all three is identical, and the County has in no way been prejudiced by the apparent inadvertent failure to place the additional case number(s) on the notice of appeal.  We therefore, turn to the merits of father's appeal.

***The Removal Orders***

" 'After the juvenile court finds a child to be within its jurisdiction, the court must conduct a dispositional hearing.  [Citation.]  At the dispositional hearing, the court must decide where the child will live while under the court's supervision.' (*In re N.M.* (2011) 197 Cal.App.4th 159, 169 . . . .)  'A removal order is proper if based on proof of a parental inability to provide proper care for the child and proof of a potential detriment to the child if he or she remains with the parent.  [Citation.]  "The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child." [Citation.]  The court may consider a parent's past conduct as well as present circumstances.' [Citation.]" (*In re A.S.* (2011) 202 Cal.App.4th 237, 247.)

"'Before the court issues a removal order, it must find the child's welfare requires removal because of a substantial danger, or risk of danger, to the child's physical health if he or she is returned home, and there are no reasonable alternatives to protect the child. [Citations.]  There must be clear and convincing evidence that removal is the only way to protect the child.' (*In re N.M., supra,* 197 Cal.App.4th at p. 170.)"[4] (*In re A.S., supra,* 202 Cal.App.4th at p. 247.)

---

[4] Section 361, subdivision (c)(1), provides in relevant part:  "A dependent child may not be taken from the physical custody of his or her parents . . . with whom the child resides at the time the petition was initiated, unless the juvenile court finds clear and convincing evidence . . . [t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's or guardian's physical custody.  The fact that a minor has been adjudicated a dependent child of the court pursuant to subdivision (e) of Section 300 shall constitute prima facie evidence that the minor cannot be safely left in the physical custody of the parent or guardian with

Father emphasizes the mandate on the dependency court to base findings on "clear and convincing" evidence. "[H]owever, ' " on appeal from a judgment required to be based upon clear and convincing evidence, 'the clear and convincing test disappears . . . [and] the usual rule of conflicting evidence is applied, giving full effect to the respondent's evidence, however slight, and disregarding the appellant's evidence, however strong.' [Citation.]" [Citation.] "We have no power to judge the effect or value of the evidence, to weigh the evidence [or] to consider the credibility of witnesses . . . ." ' (*In re Mark L.* (2001) 94 Cal.App.4th 573, 580–581 . . . , fn. omitted.)" (*In re A.S., supra,* 202 Cal.App.4th at p. 247.) We review a removal order for substantial evidence. (*In re Miguel C.* (2011) 198 Cal.App.4th 965, 969.)

On appeal, father contends the only evidence of harm to the children was witnessing domestic violence between father and mother. Since mother no longer resides with father, he maintains there is no risk of substantial danger to the children to support the removal order. He also maintains the court could insure their safety by means of a protective order, rather than a removal order.

While mother no longer resides with father, there is evidence father's domestic violence remains of concern. The court expressly found father did not acknowledge the extent of the domestic violence, and found his dissembling to be of further concern. There was also evidence father sought counseling for frustration in "dealing with his family" and how not to "lash out" when he becomes overwhelmed. Even then, he delays seeking help until "basically when he is in crisis." This evidence suggests a problem deeper than just dealing with mother, that could be provoked by frustration with the children.

---

whom the minor resided at the time of injury. The court shall consider, as a reasonable means to protect the minor, the option of removing an offending parent or guardian from the home. The court shall also consider, as a reasonable means to protect the minor, allowing a nonoffending parent or guardian to retain physical custody as long as that parent or guardian presents a plan acceptable to the court demonstrating that he or she will be able to protect the child from future harm." (§ 361, subd. (c)(1); see also Cal. Rules of Court, rule 5.695(d).)

In addition, there was evidence of other concerns. A principal one was father's housing situation. While father's residence, inside, was acceptable for the children, its locale, above a drug recovery center, was not, and the court expressly stated it was determined to keep the children "away from the recovering drug addicts." Another concern was father's mental health condition. While father asserts there is no evidence this is a current concern, there was evidence he has, during some periods of time, not taken his medication.

Thus, contrary to father's argument, this is not a case where the court allowed the children to control the outcome on the basis of claims they wanted nothing to do with father. While the court acknowledged the children wanted no contact with father, it ordered therapeutic visitation and specifically directed the CWW to encourage the children to participate.

Rather, this was, as the court observed, a very difficult situation, where none of the dispositional alternatives before the court were very good. But the grandmother's home, with proper monitoring by the County, was the most stable for the children. In essence, on appeal, father has reargued the situation, as he sees it. The dependency judge saw it differently, and there is substantial evidence in the record to support the court's disposition order.

## DISPOSITION

Father's appeal from the jurisdictional findings is dismissed. The dispositional order removing R.S., L.S. and M.S. from father's custody is affirmed.

_____
Banke, J.

We concur:

_____
Margulies, Acting P. J.

_____
Dondero, J.